UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

| | | |
|---|---|---|
| CHRISTOPHER NEVE, | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | Civil Action No: _____ |
| | **)** | |
| **v.** | **)** | |
| | **)** | |
| CLARENCE F. BIRKHEAD, in his | **)** | |
| individual and in his official capacity as | **)** | |
| Durham County Sheriff, WENDELL M. | **)** | |
| DAVIS, Durham County Manager in his | **)** | |
| individual and in his official capacity, and | **)** | |
| JOHN or JANE DOES 1-20, | **)** | |
| | **)** | |
| **Defendant.** | **)** | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

I.      INTRODUCTION AND NATURE OF THE CASE .............................................. 1

II.     STATEMENT OF FACTS .................................................................................... 3

        A.  Emergency Use Authorization ................................................................... 3

        B.  Defendant's COVID-19 Vaccine Mandate ................................................ 6

III.    STANDARD OF REVIEW ................................................................................ 10

IV.     ARGUMENT ..................................................................................................... 11

        A.  Plaintiff Is Likely to Succeed on the Merits ........................................... 11

            1.  Federal Law Prohibits Mandating Products Granted EUA ......................... 11

            2.  Defendant's Mandate and Resulting Termination Violate Substantive and
                Procedural Due Process .............................................................................. 14

            3.  Defendant's Mandate Violates N.C. Gen. Stat. § 126-85 and Constitutes
                Wrongful Termination ................................................................................. 17

        B.  Plaintiff Will Suffer Irreparable Harm Without a Preliminary Injunction ....... 18

        C.  The Balance of Equities Tip in Favor of Granting the
            Preliminary Injunction ............................................................................. 23

        D.  The Public Interest Will Be Served By the Granting of the Preliminary
            Injunction ................................................................................................. 24

V.      CONCLUSION .................................................................................................. 25

Case 1:21-cv-00308-LCB-JLW   Document 3   Filed 04/16/21   Page 2 of 31

# TABLE OF AUTHORITIES

**Cases**

*City of Greensboro v. Guilford Cnty. Bd. of Elections*,
    120 F. Supp. 3d 479 (M.D.N.C. 2015) ........................................................... 24

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1, 426 U.S. App. D.C. 67 (D.C. Cir. 2016) .................................... 18

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
    22 F.3d 546 (4th Cir. 1994) ......................................................................... 19

*N.C. Growers' Ass'n v. Solis*,
    644 F. Supp. 2d 664 (M.D.N.C. 2009) .......................................................... 22

*NAACP v. City of Myrtle Beach*, No. 4:03-1732-25TLW,
    2005 U.S. Dist. LEXIS 63770 (D.S.C. May 9, 2005) .................................. 19

*Pashby v. Delia*,
    709 F.3d 307 (4th Cir. 2013) .................................................................. 11, 24

*Radio Music License Comm., Inc. v. SESAC Inc.*, No. 12-CV-5807, 2014 U.S. Dist
    LEXIS 199010, at *n. 2 (E.D. PA Feb. 20, 2014) ........................................ 19

*Schrank v. Bliss*,
    412 F.Supp.28 (M.D. Fla. 1976) ................................................................... 24

*Westmoreland Coal Co., Inc. v. Int'l Union*,
    910 F.2d 130 (4th Cir. 1990) ........................................................................ 11

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ......................................................................................... 11

**Statutes**

10 U.S.C. § 1107a ............................................................................................... 13

21 C.F.R. 50.20 ................................................................................................... 15

21 U.S.C. § 360bbb-3 ........................................................................... 1, 9, 12, 25

21 U.S.C. § 360bbb-3(e) ..................................................................................... 12

Case 1:21-cv-00308-LCB-JLW   Document 3   Filed 04/16/21   Page 3 of 31

21 U.S.C. § 360bbb-3(e)(1) .................................................................................... 15

21 U.S.C. § 360bbb-3(e)(1)(A)(ii) ......................................................................... 14

42 U.S.C. § 1983 ................................................................................................... 15

iv

Plaintiff Christopher Neve ("**Plaintiff**"), by his attorney, hereby submits this Memorandum of Law in support of his motion for a preliminary injunction against his former employer, Clarence F. Birkhead, in his individual and in his official capacity as Durham County Sheriff, Wendell M. Davis, Durham County Manager in his individual and in his official capacity, and John or Jane Does 1-20 (collectively, "**Defendants**").

## I.   INTRODUCTION AND NATURE OF THE CASE

Drugs and biologics, which include vaccines, are licensed by the Food and Drug Administration ("**FDA**").   Until these products are licensed, they are, by definition, experimental.   To be licensed, manufacturers submit extensive data to the FDA from the drug's clinical trial to support its safety and efficacy.   Complaint at ¶ 1.

Nevertheless, Congress recognized the need for the FDA to authorize the use of certain experimental products in an emergency situation – even before they are shown to be safe and effective – under an emergency use authorization ("**EUA**").   However, until they are approved, Congress made the policy decision that members of the public should not be forced to receive an unapproved product, *i.e.*, experimental product.   It required that every recipient of the pre-approval experimental product must be informed of the known risks and benefits and then be given the choice whether to receive or refuse that product. *See* 21 U.S.C. § 360bbb-3 (individuals must be provided the "**option to accept or refuse** administration of" any product released under an EUA) (emphasis added).   (*Infra* § IV.A.; Complaint at ¶¶ 2-3.)

The FDA recently granted EUAs for three vaccines against COVID-19 sold by

1

Moderna, Pfizer, and Janssen (the "**COVID-19 Vaccines**"), however the FDA's Briefing Document granting the EUA for the COVID-19 Vaccines makes clear that there are still many critical unknowns regarding these vaccines, including their effectiveness in reducing mortality, asymptotic infection, transmission of the virus, or ability to cause vaccine enhanced disease. (*Infra* § II.A.; Complaint at ¶ 5.)

Given these unknowns, and in compliance with federal law, the EUAs issued by the FDA for the current COVID-19 Vaccines advise health care workers administering the vaccine that "[t]he recipient … has the option to accept or refuse [the] COVID-19 Vaccine" and advises the public that "[i]t is your choice to receive or not receive the [] COVID-19 Vaccine." The CDC, likewise, recently stated that "under an emergency use authorization," the "vaccines are not allowed to be mandatory[.]" (*Infra* § IV.A.; Complaint at ¶¶ 6-7.)

Plaintiff was an employee of the Durham County Sheriff's Office which is administered by Defendants. Defendants recently announced – in direct contravention of the EUAs for the COVID-19 Vaccines, the FDA and CDC guidance, Congress' intent, and federal law – that it is mandating that all of its employees, including Plaintiff, receive the COVID-19 vaccine (the "**Mandate**"). If an employee refuses, Defendants have made clear that the employee will be terminated. Plaintiff has chosen to not receive the COVID-19 vaccine and was terminated by Defendants for choosing to not take the COVID-19 vaccine. (*Infra* § IV.A.2.; Complaint at ¶¶ 8-11.)

The Mandate has irreparably harmed Plaintiff and will continue to cause harm.

Plaintiff was given the Hobson's choice of either being forced to take an experimental, unapproved vaccine against his will, or being fired, stigmatized, and having his life upended. He stood by his informed medical decision to not take an experimental product and, as a result, was illegally fired. Complaint at ¶ 12.

Plaintiff hereby seeks a preliminary injunction for these reasons, as explained *infra*, and pursuant to Federal Rule of Procedure 65(a) (i) enjoining Defendants from implementing or enforcing their illegal Mandate; and (ii) reinstating Plaintiff in his position of Sheriff Deputy along with the benefits and privileges attended thereto.

## II. STATEMENT OF FACTS

### A. Emergency Use Authorization

In December 2020, the FDA granted EUAs for two COVID-19 vaccines, one sold by Moderna and the other by Pfizer. (Ex. A; Ex. B.)[1] Both are based on an RNA technology never before used in a licensed vaccine. In February 2021, the FDA granted an EUA for a third COVID-19 vaccine manufactured by Janssen. (Ex. C.) The clinical trials that the FDA will rely upon to decide whether to license any of these novel vaccines are underway but are far from complete. (Ex. D; Ex. E; Ex. F.; Complaint at ¶ 19.)

Before clinical trials begin, the manufacturer submits to the FDA a clinical trial protocol, which estimates how long it will take to collect adequate data to establish the vaccine is both safe and effective. The FDA-approved study protocols for the COVID-19

---

[1] Exhibit references to "Ex._" refer to the exhibits attached to the Declaration of Elizabeth A. Brehm, dated April 13, 2021.

Vaccines call for collecting safety and efficacy data from trial participants for approximately two years. (Ex. D at 85; Ex. E at 42; Ex. F at 85; Complaint at ¶ 20.) (Moderna's calls for 759 days of data collection, Pfizer's 742 days, and Janssen's 24 months.)

The EUAs for Pfizer's, Moderna's, and Janssen's COVID-19 vaccine were granted on December 11, 2020, December 18, 2020, and February 27, 2021, respectively. When these companies submitted applications for an EUA, they had only accumulated data from study participants for a median of 6 to 8 weeks, *i.e.*, less than 10% of the full study period. (Ex. A; Ex. B; Ex. C.; Complaint at ¶ 21.)

Given these abbreviated timelines, the EUAs were based on data which supports that these products may reduce certain symptoms of COVID-19 for some individuals, but the FDA's EUA authorizations made clear that much remains unknown about these vaccines. In fact, the FDA Briefing Documents for the COVID-19 Vaccines supporting the grant of an EUA list the following as still **unknown**:

- "[e]ffectiveness in certain populations at high-risk of severe COVID-19,"

- "[e]ffectiveness in individuals previously infected with SARS-CoV-2,"

- "effectiveness against asymptomatic infection,"

- "effectiveness against long-term effect of COVID-19 disease,"

- "effectiveness against mortality," and

- "effectiveness against transmission of SARS-CoV-2."

(Ex. G; Ex. H; Ex. I.; Complaint at ¶¶ 22-24.) The FDA repeats, in a news release regarding

4

the second authorized vaccine, that the data was "not available to make a determination about how long the vaccine will provide protection, **nor is there evidence that the vaccine prevents transmission of SARS-CoV-2 [*i.e.*, the virus that causes COVID-19] from person to person**."  (Ex. J; Complaint at ¶¶ 22) (emphasis added.)

The Briefing Documents also make clear much is **unknown** about the safety of these products, including,

- "[a]dverse reactions that are very uncommon,"

- adverse reactions "that require longer follow-up to be detected," and

- whether the vaccines will cause "[v]accine-enhanced disease."

(*Id.*)  The seriousness of these unknowns and potential risks came to light on April 13, 2021 when the FDA put administration of the Janssen vaccine on pause due to serious adverse events, at least one of which led to a fatality.[2]  Complaint at ¶ 25.

As a result, the EUAs for the COVID-19 Vaccines expressly provide that each is "an investigational vaccine **not licensed** for any indication" and require that "**[a]ll promotional material relating to the COVID-19 Vaccine clearly and conspicuously … state that this product has not been approved or licensed by the FDA**, but has been authorized for emergency use by FDA."  (Ex. A at 9; Ex. B at 9; Ex. C at 9.)   The authorization letters also expressly approved fact sheets for health care providers and for patients regarding the COVID-19 Vaccines, both which provide that the receipt of the

---

[2]  *See*  https://www.fda.gov/news-events/press-announcements/joint-cdc-and-fda-statement-johnson-johnson-covid-19-vaccine.

vaccine must be optional.  (*Infra* § IV ; Complaint at ¶ 26.)

**B.  Defendant's COVID-19 Vaccine Mandate**

Defendant Durham County Sheriff's Office ("**DCSO**") is a comprehensive law enforcement agency and is tasked with maintaining the detention facilities of Durham County.  Complaint at ¶ 27.  Plaintiff Christopher Neve was an employee of DCSO, administered by Defendants, and worked in the role of Deputy Sheriff.  Plaintiff held this position for more than five years.  *See* Declaration of Plaintiff Christopher Neve (hereinafter, "**Decl.**") at 1.

Plaintiff was Cadet of the Month at DCSO's Academy and received an Academic Achievement Award and a Driving Award from same.  He is certified by the U.S. Department of Justice as a G.R.E.A.T. (Gang Resistance Education and Training) instructor and served as a certified School Resource Officer in a middle school for four years and, most recently, served on Patrol for a year.  He is a Crisis Intervention Team Officer and a schedule coordinator for off-duty employment.  Plaintiff has never received any complaints of disciplinary action during his training or his time at the Sheriff's Office. (Decl. at 2-3.)

On or about January 21, 2021, Sheriff Birkhead issued a memorandum (the "**Memorandum**") requiring all DCSO employees to receive a COVID-19 vaccine as a condition of ongoing employment.  (Ex. Q; Complaint at ¶ 28.)

The Memorandum explained in relevant part that:

> Getting vaccinated now will help protect you and the
> public we serve…

6

> I am requiring all employees to be vaccinated. It is
> mandatory…

Complaint at ¶ 29. By making the affirmative statement that the vaccine "will help protect you and the public we serve[,]" Sheriff Birkhead misled his employees because there is no support for such an assertion. (*Id*.; Decl. at 5-6.) As noted above, the FDA explicitly stated when granting EUAs for the COVID-19 Vaccines there is no evidence that that these vaccines prevent transmission, *see supra* at II.A.; Complaint at ¶ 30.

Likewise, Dr. Anthony Fauci, director of NIAID, has publicly stated: "We do not know if the vaccines that prevent clinical disease also prevent infection… even though you get vaccinated, we should not eliminate, at all, public health measures like wearing masks because we don't know yet what the effect [of the vaccine] is on transmissibility… We don't know that vaccinating people prevents infection… we don't know if it prevents infection." (Ex. R; Complaint at ¶ 30.)

The only evidence that currently exists is that these still experimental vaccines may reduce certain symptoms in some individuals. (Ex. G; Ex. H; Ex I.) As such, contrary to the Memorandum's suggestion, it is entirely plausible that vaccine recipients may be infected, but not know they are infected because the vaccine reduces symptoms. Such an individual would not know to isolate him or herself and could, in fact, create a greater risk of infecting others. That is why the FDA, CDC, and NC Department of Health and Human Services all advise vaccine recipients to continue to wear masks, social distance, and follow precautionary protocols. (Ex. S; Complaint at ¶ 31.)

Further, these vaccines are not free from risk. In addition to the recent adverse events leading to an FDA pause of one of the vaccines, there were serious adverse events documented following vaccination in the clinical trials, which are still underway, found by the trial investigators to not only be "linked" to the vaccines, but in fact related to the vaccines. (Ex. G at 41; Ex. H at 43-44; Ex. I at 45-52) (including, ventricular arrhythmia, lymphadenopathy, facial swelling, rheumatoid arthritis, peripheral edema, Autonomic dysfunction, B-cell lymphocytic lymphoma, deep vein thrombosis, tinnitus, arthritis/arthralgia, peripheral neuropathy, and GBS). Complaint at ¶ 32.

Furthermore, after the FDA issued the EUA, medical professionals have observed numerous serious adverse reactions linked to the COVID-19 vaccines. In fact, in the approximately four months since the EUA was issued, the CDC's Vaccine Adverse Events Reporting System, which captures "fewer than 1% of vaccine adverse events" (Ex. ), has already received reports of the following serious adverse reactions: 2,190 deaths, 4,960 hospitalizations, and 8,390 emergency room visits following receipt of the COVID-19 Vaccines. (Ex. U; Complaint at ¶ 33.)

Four days after the announced Mandate, Sheriff Birkhead sent another email on January 25, 2021 to all DCSO employees, stating in relevant part:

> Today was the last day for DCSO employees to get the COVID vaccine without having to schedule an appointment…That said, I am disappointed with the low compliance rate of employees taking advantage of this opportunity. I must remind you this is Not an Option – taking the vaccine is Mandatory for all DCSO employees…Failure to take the vaccine could result in disciplinary action.

8

(Ex. W; Decl. at 7.)  Sheriff Birkhead's email ironically they claims to address "myths" regarding the COVID-19 Vaccines, including that they have not been approved, by writing that "the Pfizer vaccine … has been approved by the United States Food and Drug Administration (FDA)."  (Ex. V.)  This is categorically false.  No COVID-19 vaccine has been approved or licensed by the FDA.

The email further states: "The Sheriff does have the authority to make taking the vaccine mandatory as a condition of employment, and does not violate any of your constitutional rights."  *Id*.  This too is incorrect because 21 U.S.C. § 360bbb-3 prohibits the Sheriff, or any other employer, from mandating a vaccine approved under an EUA. Complaint at ¶ 36.

On or about January 29, 2021, Plaintiff received an email from DCSO inquiring as to his "plans" regarding the COVID-19 vaccine and responded that he did not wish to share his personal medical information.  (Ex. W; Decl. at 9.)

On February 5, 2021, Plaintiff received a memo from Sheriff Birkhead seeking a note from Plaintiff's doctor excusing him from the vaccine for medical reasons or, in the alternative, documentation that he had received the vaccine before March 5, 2021.  (Ex. X; Decl. at 10.)

On Wednesday, March 10, 2021, Plaintiff received an email addressed to him and nine other co-workers notifying them of individually scheduled meetings with Sheriff Birkhead to discuss the COVID-19 vaccination.  (Ex. Y; Decl. at 11.)

Plaintiff met with Sheriff Birkhead and his legal advisor, Keisha Lovelace, on

March 12, 2021. In the meeting, Plaintiff was reminded that vaccination was a requirement for employment and was asked whether he received the COVID-19 vaccine. Plaintiff would not confirm that he would take the vaccine. Sheriff Birkhead then had Plaintiff's equipment (e.g., bulletproof vest, badge, duty belt, radio, handcuffs, gun, and patrol car) taken from him on the spot and placed him on administrative leave without pay. (Ex. Z; Decl. at 12.) Plaintiff has been out of work since this meeting without pay, nor has he been permitted to use his saved vacation or paid time off.

Plaintiff called the Durham County Manager, Defendant Davis, to make him aware of his situation. (Decl. at 16.) Jodi Miller, General Manager of Community and Public Safety, responded to Plaintiff on behalf of Defendant Davis "regarding [his] leave without pay status for insubordination related to the Sheriff's COVID-19 vaccination mandate" which stated that "North Carolina General Statue § 153A-103 provides that the Sheriff has the exclusive right to hire, discharge, and supervise employees in their office." (Ex. AA; Decl. at 16.)

Plaintiff again met with Sheriff Birkhead on March 26, 2021 where he was terminated. (Ex. BB; Decl. at 18-19.)

Plaintiff has not consented to and does not consent to receive the COVID-19 vaccine. Among other reasons, the vaccines are still undergoing clinical trials and are not yet approved or licensed for use. (Decl. at 20.)

## III. STANDARD OF REVIEW

To obtain a preliminary injunction, a party must show: (1) a likelihood of success

on the merits, (2) a likelihood of irreparable harm if the injunctive relief is denied, (3) that the balance of equities tips in its favor, and (4) that injunctive relief would be in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Whether to grant a preliminary injunction is within the sound discretion of the district court. *Westmoreland Coal Co., Inc. v. Int'l Union*, 910 F.2d 130, 135 (4th Cir. 1990). Courts typically employ preliminary injunctions in order to maintain the status quo, or the "last uncontested status between the parties which preceded the controversy," as well as to prevent irreparable harm during the course of litigation, thereby preserving the possibility of a meaningful judgment on the merits. *See Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013).

## IV.    ARGUMENT

### A.  Plaintiff Is Likely to Succeed on the Merits

Plaintiff has "a reasonable likelihood of success on the merits" because Defendants' Mandate is prohibited by federal law and the retaliation and termination which resulted violate the Constitution and North Carolina state law.

#### 1.  *Federal Law Prohibits Mandating Products Granted EUA*

The same section that authorizes the FDA to grant an EUA, Section 564 of the Federal Food, Drug, and Cosmetic Act (the "**Act**"), codified at 21 U.S.C. § 360bbb-3, requires that the public have "the option to accept or refuse administration of the product." 21 U.S.C. § 360bbb-3(e). It even provides that the Secretary of HHS is to "ensure that individuals to whom the product is administered are informed" of "the option to accept or

11

refuse administration of the product." (*Id.*)

The FDA and CDC's guidance and regulations reflect this statutory requirement. For example, the FDA guidance entitled *Emergency Use Authorization of Medical Products and Related Authorities* provides that:

> …section 564 does provide EUA conditions to ensure that recipients are informed about the MCM [medical countermeasure] they receive under an EUA. For an unapproved product [such as the COVID-19 vaccines], the statute requires that **FDA ensure that recipients are informed** to the extent practicable given the applicable circumstances … **That they have the option to accept or refuse the EUA product**…

*See* Ex. CC at 24 (emphasis added). Similarly, when responding to an inquiry regarding whether the COVID-19 Vaccines can be required, the Executive Secretary of the CDC's Advisory Committee on Immunization Practices, Dr. Amada Cohn, publicly stated that "under an under an EUA, **vaccines are not allowed to be mandatory**. Therefore, early in the vaccination phase **individuals will have to be consented and cannot be mandated to be vaccinated**." (Ex. DD at 56.) Dr. Cohn then reaffirmed to the FDA's Vaccine and Related Biological Products Advisory Committee that no organization, public or private, can mandate the COVID-19 Vaccines:

> Organizations, such as hospitals, with licensed products do have capability of asking their workers to get the vaccine. But in the setting of an EUA, patients and individuals will have the right to refuse the vaccine.

(Ex. EE at 156.)

As evidence of the importance Congress placed on an individual's right to refuse an

12

EUA product, it carved out only one exception for when a product granted an EUA *can* be required: when the President of the United States orders members of the armed forces to receive that product.  10 U.S.C. § 1107a.  This sole exception is not applicable to this matter.

Reflecting the relevant federal law prohibiting mandating an EUA product, Pfizer, Moderna, and Janssen's EUA letters provide that each

> COVID-19 Vaccine is authorized for emergency use with the following product specific information required to be made available to the vaccination providers and recipients, respectively (referred to as 'authorized labeling'):
>
> • Fact Sheet for Health Care Providers Administering Vaccine
>
> … [and]
>
> • Fact Sheet for Recipients and Caregivers.

(Ex. A at 4; Ex. B at 4; Ex. C at 4.)  These facts sheets provide that the receipt of the vaccine must be optional.  The Fact Sheets for Healthcare Providers for the COVID-19 vaccines state that: "The recipient …  has the option to accept or refuse [the] COVID-19 Vaccine." (Ex. K at 7; Ex. L at 4; Ex. M at 3.)  Similarly, the Fact Sheets for Recipients and Caregivers for the COVID-19 vaccines state on the first page: "**It is your choice to receive the [] COVID-19 Vaccine.**"  (Ex. N at 1; Ex. O at 1; Ex. P at 1.)

The Fact Sheet for Recipients for each of the COVID-19 Vaccines also set forth in sequence the multiple pieces of information required to be provided to recipients of the vaccine pursuant to section 564 of the Act, including "the option to accept or refuse

13

administration of the product" and "the consequences, if any, of refusing administration of the product." 21 U.S.C. § 360bbb-3(e)(1)(A)(ii).  Both COVID-19 Vaccine Fact Sheets provide the relevant information to satisfy each of these requirements in sequence, including telling potential recipients: "It is your choice to receive or not receive the [] COVID-19 Vaccine[,]"  and that if "you decide to not receive it, it will not change your standard of medical care."  (Ex. N at 4; Ex. O at 4; Ex. P at 4.)

By implementing their vaccine Mandate, Defendants are attempting to coerce all of their employees into receiving a COVID-19 Vaccine.  They are deliberately taking away each employee's statutorily guaranteed right to decide for him or herself whether to accept or refuse administration of a COVID-19 Vaccine.  Defendants are doing so openly, without any regard for federal law or the personal medical decisions of their employees. (Decl. at 5.)  Worse still, Defendants are attempting to justify their policy to their employees by using false and misleading information.  (*Supra* at II.B.)   In sum, Defendants' Mandate and policy of coercion through the threat of termination and retaliation directly contravenes the Act, the EUAs, and the FDA and CDC Guidance, and is unlawful.

### 2. *Defendant's Mandate and Resulting Termination Violate Substantive and Procedural Due Process*

Defendants' Mandate constitutes the official policy of Durham County and DCSO such that these Defendants, along with Sheriff Birkhead and Defendant Davis, are "persons" under 42 U.S.C. § 1983 and they have instituted their Mandate under color of law as state actors.

The United States Constitution guarantees the substantive due process rights to

liberty, life, bodily integrity, and informed consent which cannot be infringed upon without a compelling state interest that is implemented in the least restrictive means.

Congress has made clear that experimental medical products cannot be forced upon anyone except for the military upon a Presidential order. (*Supra* § IV.A.1.) This right is repeated numerous times in federal law, regulations, and guidance. *See e.g.*, 21 U.S.C. § 360bbb-3(e)(1) (the Act); 21 C.F.R. 50.20; *FDA Emergency Use Authorization for Vaccines Explained*[3]; FDA Guidance *Emergency Use Authorization of Medical Products*[4]; FDA Notice *Authorization of Emergency Use of Anthrax Vaccine*[5].

The right to informed medical consent is also considered a fundamental, overriding principle of medical ethics and is part of common international law and was first laid down by United States government jurists in the Nuremberg Code. *See e.g.*, The Nuremberg Code (1947), 313 BMJ 1448 (1996)[6] *see also* UNESCO Universal Declaration on

---

[3] https://www.fda.gov/vaccines-blood-biologics/vaccines/emergency-use-authorization-vaccines-explained.

[4] https://www.fda.gov/media/97321/download ("For an unapproved product…the statute requires that FDA ensure that recipients are informed … [t]hat they have the option to accept or refuse the EUA product.")

[5] *See* https://www.federalregister.gov/d/05-2028/p-70) ("[w]ith respect to … the option to accept or refuse administration of [anthrax vaccine not yet approved by the FDA], the AVIP will be revised to give personnel the option to refuse vaccination. Individuals who refuse anthrax vaccination will not be punished. Refusal may not be grounds for any disciplinary action… Refusal may not be grounds for any adverse personnel action. …. There may be no penalty or loss of entitlement for refusing anthrax vaccination.").

[6] http://www.cirp.org/library/ethics/nuremberg ("The voluntary consent of the human subject is absolutely essential.  This means that the person…[is] able to exercise free power of choice, without the intervention of any element of…coercion.") .").

15

Bioethics and Human Rights, Article 6(1).[7]

It is a deprivation of Plaintiff's substantive due process rights to coerce him under threat of termination from employment for refusing to be injected with an unapproved and experimental product.

The COVID-19 Vaccines have also not demonstrated they can prevent infection and transmission of the virus that causes COVID-19, which is why health authorities still provide that those receiving the vaccine continue to wear a mask, socially distance, and practice all other virus prevention measures. Irreparable harms have resulted and will result from the violation of these Constitutional rights which cannot be adequately redressed.

Additionally, Plaintiff was placed on unpaid administrative leave, charged with insubordination, and subsequently terminated without any notice, hearing, or written statement of the reasons that may constitute just cause for his leave or termination. Plaintiff was not permitted to present his full position before any impartial decision-maker. Therefore, Plaintiff was deprived by Defendants of his de facto property interest in his job without the guarantees of procedural due process under the Fourteenth Amendment.

---

[7] http://portal.unesco.org/en/ev.php-URL_ID=31058&URL_DO=DO_TOPIC&URL_SECTION=201.html (providing that "[a]ny preventive … medical intervention is only to be carried out with the prior, free and informed consent of the person concerned… The consent should, where appropriate, be express and may be withdrawn by the person concerned at any time and for any reason without disadvantage or prejudice.").

### 3. Defendant's Mandate Violates N.C. Gen. Stat. § 126-85 and Constitutes Wrongful Termination

North Carolina law forbids any State employee from discharging or retaliating against another State employee because that employee refuses to carry out a directive which violates state or federal law, rule, or regulation. Indeed, N.C. Gen. Stat. § 126-85(b) provides that:

> No head of any State department, agency or institution or other State employee exercising supervisory authority shall discharge, threaten or otherwise discriminate against a State employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the State employee has refused to carry out a directive which in fact constitutes a violation of State or federal law, rule or regulation or poses a substantial and specific danger to the public health and safety.

And N.C. Gen. Stat. § 126-85(b)(1) provides that:

> No State employee shall retaliate against another State employee because the employee has refused to carry out a directive which may constitute a violation of State or federal law, rule or regulation, or poses a substantial and specific danger to the public health and safety.

Sheriff Birkhead violated this statute. While exercising supervisory authority as a state employee, Sheriff Birkhead discharged, threatened, intimidated, and otherwise discriminated against Plaintiff regarding Plaintiff's compensation, terms, conditions, location, and privileges of employment when he placed Plaintiff on administrative leave without pay and subsequently terminated him. Sheriff Birkhead did so because Plaintiff refused to comply with the Mandate, directed by Defendants, which constitutes a violation of federal law, rule, and regulation, as well as the Constitution.

17

Sheriff Birkhead willfully violated N.C. Gen. Stat. § 126-85 as it was brought to his attention that the Mandate was in violation of federal law. Plaintiff has not been able to return to work and has not received any pay since the date of his administrative leave. Plaintiff was subsequently terminated on March 26, 2021.

Based on the foregoing, Plaintiff has a very strong likelihood of success on the merits of his claims.

### B. Plaintiff Will Suffer Irreparable Harm Without a Preliminary Injunction

Plaintiff has suffered and will continue to suffer irreparable harm if a preliminary injunctive relief is not granted. Irreparable harm is demonstrated when it is "certain and great, actual and not theoretical, and so imminen[t] that there is a clear and present need for equitable relief," and once it is suffered, it is "beyond remediation." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7-8, 426 U.S. App. D.C. 67 (D.C. Cir. 2016). Plaintiff has already suffered certain, great, and actual harm and it will persist until equitable relief is granted.

Absent an immediate injunction, Plaintiff and his colleagues are left with the Hobson's choice to either: (a) be forced, in violation of federal law and against their will, to be injected with an unlicensed, experimental vaccine; or (b) be terminated from their jobs. "[T]he choice offered by a party in a Hobson's Choice scenario *can* constitute irreparable harm." *Radio Music License Comm., Inc. v. SESAC Inc.*, No. 12-CV-5807, 2014 U.S. Dist LEXIS 199010, at *n. 2 (E.D. PA Feb. 20, 2014).

A vaccine injection is a prototypical irreparable harm because it cannot be undone,

nor can money compensate for the resulting harm. An injury is typically deemed irreparable if monetary damages are inadequate or difficult to ascertain. *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994).

On the other hand, Defendants have enforced their Mandate that any employee that does not receive the vaccine will be terminated. This requirement to receive an experimental vaccine is a direct violation of Plaintiff's statutory right under the Act and of Plaintiff's Constitutional rights and hence constitutes irreparable harm. *NAACP v. City of Myrtle Beach*, No. 4:03-1732-25TLW, 2005 U.S. Dist. LEXIS 63770, at *6 (D.S.C. May 9, 2005) ("[T]he courts of this country have consistently held that the violation of a constitutional right constitutes irreparable injury as a matter of law.") (collecting cases.)

Without his job and income, Plaintiff will be unable to support himself or his wife and unable to pay his family's monthly bills. Plaintiff will struggle to be able to afford health insurance during a time of extreme emotional stress. (Decl. at 23.)

Plaintiff was a non-probationary, permanent civil service employee with an unmarred record and a reasonable expectation of continued employment. (Decl. at 24.)

Given state statutes and practices regarding certification for Plaintiff's position, and the culture of law enforcement jobs in the region, every potential law enforcement employer will be alerted to the alleged reason for Plaintiff's termination. It is nearly certain that law enforcement agencies will refuse to hire an employee who was involuntarily terminated from another agency. (Decl. at 25.) Even if this were not the case, Plaintiff

19

will suffer a loss of reputation within the law enforcement community and for this additional reason is unlikely to find alternative work in his field. The stigma to Plaintiff's professional reputation created by his unlawful termination will be irreparable. (Decl. at 26.)

Plaintiff has not been provided with any administrative proceeding or procedural due process following his unpaid leave or his termination, nor has he been told that such a proceeding will be arranged. (Decl. at 27.)

Further, losing one's job during regular times, let alone during one of the worst peacetime recessions in 100 years,[8] has also been shown to be "clearly traumatic" and "can have spillover effects into one's life at home."[9] The subsequent search for a new job also poses a risk: "research has shown that the job search process itself can result in decreased psychological well-being." *Id*.

Plaintiff has suffered and will suffer emotional harm as a result of being placed on unpaid leave and then terminated. Plaintiff was humiliated when escorted out of the DCSO into a public location and made to turn in his equipment and when he was subsequently driven home to his wife, without his full uniform and equipment, and asked to bring all

---

[8] *See This is the worst peacetime recession in 100 years, OECD says* available at https://www.cnn.com/2020/06/10/economy/oecd-coronavirus-economy/index.html; *see also COVID-19 to Plunge Global Economy into Worst Recession Since World War II* available at https://www.worldbank.org/en/news/press-release/2020/06/08/covid-19-to-plunge-global-economy-into-worst-recession-since-world-war-ii.

[9] *See The traumatic impact of job loss and job search in the aftermath of COVID-19* available at https://content.apa.org/fulltext/2020-37341-001.html.

DCSO equipment out of his house and hand it over to his colleagues in full view of his neighbors. (Decl. at 28.)

When the reality of what happened sunk in, Plaintiff was emotionally distraught. He suffered great stress worrying about how he would support his wife, what his friends and family would think, and what his future would hold. Since his termination, Plaintiff has been consumed with thoughts about future alternate employment, especially given the current state of the workforce and economy. The permanent loss of his job and the resulting harms have and will cause stress on his marriage and on his wife. Plaintiff has feelings of despair that all his work and efforts to maintain a perfect record and good reputation among his supervisors, colleagues, and residents of the community has been ruined by the illegal mandate. A feeling of hopelessness will persist until he is able to obtain another job, one that would not mandate the same product nor hold his termination from another law enforcement agency against him. (Decl. at 29-30.)

Plaintiff has felt health repercussions from his anxiety and stress; this began when he was notified of the Mandate and continues indefinitely. Plaintiff is feeling depressed and anxious about his tarnished name and the mark on his otherwise impeccable character. (Decl. at 31.)

Plaintiff's damages related to loss of income may not be recovered if precluded by constitutional and/or statutory immunity. They are therefore irreparable yet will continue to accumulate. *See N.C. Growers' Ass'n v. Solis*, 644 F. Supp. 2d 664, 670-671 (M.D.N.C. 2009) (finding that unrecoverable economic losses constitute irreparable harm).

The harms already incurred and those to be incurred by Plaintiff constitute irreparable injury and are of exceptional circumstance. (Decl. at 33.)

Defendants, on the other hand, will not be harmed if their Mandate is enjoined and if Plaintiff is reinstated. Defendants are free to strongly encourage, recommend, and assist their employees to receive the COVID-19 vaccine. However, these products have not been approved nor have they been shown to prevent the vaccinee from becoming infected with and transmitting the virus that causes COVID-19; for this reason, everyone working for Defendants, whether they have been vaccinated or not, must continue with all of the same precautions for avoiding contracting and spreading the virus. Further, an injunction would restrain enforcement of an unconstitutional law and serve the public interest by ensuring that Plaintiff and other employees may continue to exercise their statutory right to refuse an EUA product and their constitutional rights to informed consent and bodily integrity. An injunction would reinstate a Deputy Sheriff to his rightful position allowing him to serve his community and continue his pristine record in law enforcement, benefitting everyone.

*Schrank v. Bliss* is instructive. There, the plaintiff, also a deputy sheriff, filed a motion for a preliminary injunction in a wrongful termination action. The plaintiff had been suspended and subsequently terminated for insubordination. The plaintiff lost his salary and medical insurance. The plaintiff also was harmed by the stigma attached to his termination; all employing law enforcement agencies notify the State when an employee is terminated. All future potential law enforcement employers then learn about plaintiff's

22

termination making the likelihood of his securing another job very low. The plaintiff sought to enjoin defendant from altering his employment status pending the outcome of the action. The court found that the plaintiff had demonstrated irreparable harm in the face of these facts and, additionally, where the plaintiff had meager prospects for recovering any lost wages that would have continued to accumulate due to potential constitutional and/or statutory immunity. The court held that "far from one mere fact in itself being irreparable harm…the totality of the circumstances surrounding plaintiff's termination in this case demonstrably constitutes the very kind of irreparable injury that requires this extraordinary relief." The court granted the injunction, ordering that the defendant reinstate the plaintiff to his permanent position as a deputy sheriff. *Schrank v. Bliss*, 412 F.Supp.28 (M.D. Fla. 1976). The same result is appropriate here.

There is no remedy at law and no amount of money that can undo the foregoing harms.

### C. The Balance of Equities Tip in Favor of Granting the Preliminary Injunction

The third factor to consider in granting a preliminary injunction is a balance of the equities. *See City of Greensboro v. Guilford Cnty. Bd. of Elections*, 120 F. Supp. 3d 479, 486 (M.D.N.C. 2015).

Plaintiff merely seeks to preserve the status quo which the Fourth Circuit has defined as the "last uncontested status between the parties which preceded the controversy." *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). If a preliminary injunction is not granted, Plaintiff will continue to suffer irreparable harm as detailed *supra*.

23

On the other hand, if an injunction is granted, Defendants will not suffer any harm, as detailed *supra*.

Furthermore, given the clear illegality of Defendants' Mandate, Plaintiff should not be forced to suffer the indignity and stigma of termination simply to uphold the explicit right granted him by Congress to make an informed decision about receiving an experimental product. This is especially true in the face of Defendants' deceptive and misleading statements in Sheriff Birkhead's emails, which Defendants employed to coerce their employees into accepting an illegal Mandate. The Court should not reward such behavior.

### D. The Public Interest Will Be Served By the Granting of the Preliminary Injunction

Congress already decided in the Act that the public interest is best served by allowing individuals to make their own medical decisions when it comes to experimental products, even during times of emergency. Congress could have allowed companies like Defendants to mandate EUA products. Instead it chose to explicitly require that every individual must be allowed to freely choose whether to be injected with an experimental EUA product, like the COVID-19 Vaccines. *See* 21 U.S.C. § 360bbb-3. Even during this pandemic, the FDA and CDC guidance related to the COVID-19 Vaccines reinforced that policy decision to allow individuals to make their own decisions. (Ex. A; Ex. B; Ex. C; Ex. DD, Ex. EE.)

In light of these clear policy decisions made at the highest levels of government, the public interest in this case will be best served by not permitting Defendants to blatantly

violate the federal law intended to protect the individual's right to choose.  Whether the COVID-19 Vaccines are actually safe and effective is not yet known and will not be known until, at the earliest, the Phase III clinical trials are completed, and the data produced by these trials show these products to be safe and effective.  (*See* Ex. D at 85; Ex. E at 42; Ex. F at 85; Ex. G at 7; Ex. H at 6; Ex. I at 7.)

## V.    CONCLUSION

Plaintiff respectfully requests this Court grant his motion for a preliminary injunction and enter an order in the form of the proposed order filed concurrently with this motion.

Dated: April 14, 2021

/s/ Aaron Siri
Aaron Siri (notice of special appearance pending)
/s/ Elizabeth A. Brehm
Elizabeth A. Brehm (notice of special appearance pending)
**SIRI & GLIMSTAD LLP**
200 Park Avenue, 17th Floor
New York, NY 10166
aaron@sirillp.com
ebrehm@sirillp.com
Phone: 212-532-1091
Fax: 646-417-5967


/s/ Jeffery Dobson
North Carolina State Bar No.: 54808
**DOBSON LAW FIRM, PLLC**
119 SW Maynard Road, Suite 220
Cary, NC 27511
jdobson@dobsonlawnc.com
Phone: 919-591-2240
Fax: 919-591-2247

Attorneys for the Plaintiff

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.3(d)(1), the undersigned counsel hereby certifies that the foregoing Plaintiff's Memorandum of Law in Support of His Motion for a Preliminary Injunction contains 6,245 words (including headings and footnotes) as measured by Microsoft Word.


/s/ Jeffery Dobson
Jeffery Dobson